# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### BRYSON CITY DIVISION

### CIVIL CASE NO. 2:11cv07

| | |
|---|---|
| ROBERT GUNKEL and wife, <br> KIMBERLY GUNKEL, <br><br> Plaintiffs, <br><br> vs. <br><br> ROBBINSVILLE CUSTOM MOLDING, INC., <br> a/d/b/a ROBBINSVILLE CUSTOM <br> MOULDING and JOHN GARLAND, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM OF DECISION AND ORDER

**THIS MATTER** is before the Court on the Defendants' Motion for Summary Judgment [Doc. 44] and the Plaintiffs' Motion to Amend Complaint. [Doc. 50].

This cause arises from a contract for construciton of a residence on the shore of Lake Santeelah in Graham County, North Carolina. The Plaintiffs are owners of the property on which the residence was to be constructed. They contracted with Defendant Robinsville Custom Molding, Inc. (RCM) by way of a scant two-page agreement that the parties prepared for themselves without

seeking the aid of counsel or any construction contract forms. The contract fails to include many, if not most, of the provisions ordinarily seen in a construction contract. It is undisputed, however, that the contract was a "cost plus" contract, whereby the Plaintiffs agreed to pay RCM's actual cost of construction plus twelve (12%) percent. [Doc. 45-2].

Before the residence was completed the Plaintiffs and RCM parted ways by executing a "Dissolution Agreement." [Doc. 47-13]. Notwithstanding the fact that the parties have agreed to dissolve their contractual relationship, the Plaintiffs bring several claims against the Defendants asserting defects in RCM's work and misrepresentations in the formation of the contract. These claims fall into three categories: 1) claims for breach of contract, including claims for breach of express and implied warranties, 2) claims for deception including fraud, deceptive trade practices and negligent misrepresentation, and 3) claims for negligent construction.

## STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, summary judgment shall be awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, ... show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has observed, "this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly

2

supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003), cert. denied 541 U.S. 1042, 124 S.Ct. 2171, 158 L.Ed.2d 732 (2004) (emphasis in original).

A genuine issue of fact exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party. Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994), cert. denied 513 U.S. 814, 115 S.Ct. 68, 130 L.Ed.2d 24 (1994) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat, 346 F.3d at 522 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist. Id.

A party opposing a properly supported motion for summary judgment

"may not rest upon the mere allegations or denial of [his] pleadings," but rather must "set forth specific facts showing that there is a genuine issue for trial." Furthermore, neither "[u]nsupported speculation," nor evidence that is "merely colorable" or "not significantly probative," will suffice to defeat a

3

motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that "reasonable minds could differ" on a material point, then, regardless of "[a]ny proof or evidentiary requirements imposed by the substantive law," "summary judgment, if appropriate, shall be entered."

Id.

Nonetheless, in considering the facts for the purposes of a summary judgment motion, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## DISCUSSION

**Breach of Contract/Breach of Warranty**

The Plaintiffs have offered evidence that they have experienced various problems with the residence. In their Complaint they very generally allege that these problems arise from RCM's breach of the contract. In response to the Motion for Summary Judgment the Plaintiffs argue that RCM breached in the following ways: 1) RCM failed to do certain soils testing that Plaintiffs assert RCM was legally obligated to have done, 2) RCM failed to build the residence in accord with the plans and specifications as they pertain to a handful of specifically identified items, and 3) RCM did not complete the

project in a timely manner. For the reasons set forth below, the Court concludes that the Plaintiffs have failed to present a forecast of evidence sufficient to survive summary judgment on the issue of whether RCM breached the contract or breached any warranty.

The Plaintiffs' forecast of evidence presents the Court with certain unusual difficulties. First, while they argue that RCM's work was not in conformity with the plans and specifications, the Plaintiffs have failed to offer into evidence the plans and specifications.[1] They rely instead on the rather scant opinions and statements of others as to what the plans and specifications require. Second, in opposition to the Motion for Summary Judgment they have offered the opinions and reports of three engineers and an architect, but these individuals were never designated by the Plaintiffs as expert witnesses and thus there was no proper opportunity for the Defendants to conduct discovery of them as experts. These matters are addressed below

---

[1] The Plaintiffs have filed sixteen sheets of architectural and engineering drawings as part of the record. They have been reduced in size to the degree that the legibility of nearly all is greatly impaired. Nonetheless, six of those sixteen sheets are plans pertaining to remedial matters rather than construction plans. Six more appear to pertain to the construction of the terrace and spa which were added much later in the project (with three of these being copies of the same page). The remaining pages include a ceiling plan, a roof plan and roof and balcony details, which have nothing to do with the defects the Plaintiffs assert. [Doc. 47-3 at 8-14, 24-29, 32, Doc. 47-4 at 22-23]. In short, between the illegibility of the copies submitted and the pages the Plaintiffs have chosen to submit, the Court cannot discern *anything* regarding what the plans call for on any point in controversy. In addition, *no* portion of the specifications is in the record.

in analyzing the specific claims advocated by the Plaintiffs.

## A. Insufficient Soils Testing

At the summary judgment hearing and in response to the Defendants' Motion for Summary Judgment the Plaintiffs have emphasized a claim regarding RCM's failure to test the soils at the construction site. Even though the Plaintiffs did not allege this claim in their Compaint [Doc. 1], the Defendants do not object on this basis, and appear to have had an adequate opportunity to discover this claim and defend against it. [Doc. 48].

The Plaintiffs assert that the structural design of the residence was prepared based on the assumption that the soils at the building site had a load bearing capacity of 2000 pounds per square foot (psf) [Doc. 45-5 at 7, 9], and that RCM's failure to have the soils tested by a geotechnical engineer to confirm this assumption consituted a breach of the contract. [Doc. 47 at 12-13]. Plaintiffs have presented nothing in opposition to the Motion for Summary Judgment, however, to show that RCM had any contractual duty to test the soil. The contract is silent on the point. Architect Michael Johnstone testified that "Neither the construction contract nor the design provide instruction, direction or notes advising the contractor to undertake a soils investigation; instead, the *design purports to provide assurance regarding the*

*soil bearing capacity on site*." [Doc. 44 at 12](emphasis added). The Plaintiffs'

design engineer, Pierre Coiron, confirms this. [Doc. 45-5 at 33-34] ("There

were no notes on any of the structural sheets detailing the compacted soil

requirements.") The Plaintiffs' architect, Timothy Adams, testified that the

recommendation to do any soils testing would come from the design engineer

(Coiron), but that in this case no such recommendations were made. [Doc. 45-

4]. As such, even Plaintiffs' evidence shows that RCM had no obligation to

test the soil, so RCM's failure to test cannot constitute a breach.

Defendant John Garland testified that "Per the engineered foundation

plans, I cut to undisturbed soil in order to construct the footers." [Doc 44 at 5].

This is undisputed. [Doc. 55 at 23-25]. RCM's performance, therefore, falls

within the Spearin Doctrine. This doctrine, first articulated in <u>United States v.</u>

<u>Spearin</u>, 248 U.S. 132, 63 L.Ed. 166 (1918), is that a contractor is not liable

to the owner for any defect in construction if the contractor has complied with

the plans and specifications provided by the owner or his agent (architect or

engineer). North Carolina law recognizes the Spearin Doctrine. As the North

Carolina Court of Appeals stated,

> [A] construction contractor who has followed plans and
> specifications furnished by the owner, or his architect or engineer,
> will not be responsible for consequences of defects in those plans
> or specifications. The rationale for the rule is that if there is an

implied warranty by the owner that the plans and specifications are suitable for the particular purpose, and that if they are complied with[,] the completed work will be adequate to accomplish the intended purpose. A party asserting such a claim must show that the plans and specifications were adhered to, that they were defective, and that the defects were the proximate cause of the deficiency in the completed work.

ABL Plumbing and Heating Corp. v. Bladen County Bd. of Educ., 175 N.C. App. 164, 169, 623 S.E.2d 57 (2005), review denied 360 N.C. 362, 629 S.E.2d 846 (2006) (internal quotations and citations omitted). See also, Burke County Bd. of Education v. Juno Construction Corp., 50 N.C. App. 238, 241, 273 S.E.2d 504 (1981). RCM has presented two expert opinions (of Johnstone and engineer Kevin Alford) that, although RCM adhered to the architectural and structural drawings and plans, those drawings and plans were defective and the defects therein were the proximate cause of the damage at issue. [Doc. 44]. The Plaintiffs have not presented any admissible evidence in rebuttal.

On this point the Plaintiffs rely on the testimony of their design engineer, Coiron, who testified that the International Residential Code (IRC) imposes a legal obligation on the contractor to test the soil to determine the suitability of the site. [Doc. 47-10 at 2-5]. However, when shown a copy of the IRC and specifically asked "can you show me in there anywhere where it says the

contractor is supposed to determine the soil-bearing capacity on the site?" he responded that "It wouldn't be in here." [Doc. 45-5 at 5]. As such, Coiron's opinion is merely his legal interpretation of what obligations the law imposes on a contractor. Such a statement is a legal conclusion. The engineer is not competent to offer any opinion as the law. The Plaintiffs have made no such legal argument in their brief in opposition to summary judgment. They have not presented any legal authority or any portion of the IRC or even any citation thereto in support of their engineer's legal contention. Nor have they presented anything from which the Court may take judicial notice of any applicable portion of the IRC that could be construed to support such a position. See, N.C. Gen. Stat. §143-138(l), Fed. R. Evid. Rule 201. Therefore, there is nothing before the Court to support the Plainitffs' bare assertion that the law required RCM to test the load-bearing capacity of the soil. Likewise, the Plaintiffs have pointed to no admissible evidence in the record showing that RCM had any contractual oblgation to determine whether Plaintiffs' engineer's footing design was adequate, considering the undisturbed soil conditions found at the site. In fact, Plaintiff's engineer tacitly recognized this deficiency in the Plaintiffs' claim when he testified that if the *county building inspector* found the soils to be inadequate then it would be the *engineer's*

*responsibility* to re-design the footings. [Doc. 45-5 at 5-7].

The Plaintiffs have presented evidence that they have experienced cracking in the foundation slab and in some locations in the drywall. They have presented an engineer's report[2] that the cracking resulted from settlement of the underlying soil. The Plaintiffs, however, have presented nothing to show that the load bearing capacity of the soil or the determination thereof was the contractual responsibility of RCM. The undisputed evidence before this Court is that the design engineer instructed RCM to construct the residence on undisturbed soil. The Plaintiffs' engineer assumed that the undisturbed soil had a load bearing capacity of at least 2000 psf, but did nothing to confirm that assumption. The engineer relied upon his *legal* assumption that the law imposed upon the contractor the obligation to confirm the engineer's *physical* assumptions about the soil conditions. However, neither the Plaintiffs' engineer nor the Plaintiffs themselves did anything to communicate this to RCM. Moreover, the Plaintiffs included no term in their

---

[2] The only evidence that tends to show that the soils upon which the residence was constructed do not have a load bearing capacity of at least 2000 psf is the report of the detailed tests of consulting engineer David Miller of Nova engineering and environmental. [Doc. 47-5]. Plaintiffs, however, did not designate Miller as an expert witness they intended to offer at trial. As addressed in more detail, *infra*, this evidence is, therefore, inadmissible. As such, the Plaintiffs fail to present any admissible evidence that any lack of testing (by *anyone*) was in any way causally connected to the problems that the Plaintiffs have experienced with the structure.

agreement to contractually impose such an obligation upon RCM.

For these reasons, the Plaintiffs' argument is without merit. The Plaintiffs have failed to present a forecast of evidence that would tend to show that RCM breached the contract by failing to test the soils. Therefore, the Defendants are entitled to summary judgment on this issue.

## B. Construction Defects

Plaintiffs have pleaded very generally that RCM's construction is defective. Plaintiffs allege in their Complaint that RCM

> a) failed to perform the work consistent with the project plans and specifications; b) failed to perform the work consistent with applicable building codes; c) failed to perform the work consistent with the reasonable construction industry standards; . . . g) failed to provide adequate supervision on the project; h) failed to provide adequate manpower properly trained to do the work; [and] i) failed to properly sequence the work.

[Doc. 1 at 2].

In response to the Defendants' Motion for Summary Judgment, Plaintiffs have argued more specifically that these failures consist of:

1. The stairs from the main floor to the basement are not built according to the plans, [Doc. 47 at 11];

2. Certain masonry walls are defective, [Id. at 11-12];

3. The stud walls in the basement are not properly constructed, [Id.];

4.  The concrete slab contains rebar rather than wire mesh, [Id. at 7-8, 13];

5.  A certain below-grade wall was built with a concrete masonry units (CMUs), which was improper, [Id. at 12];

6.  The HVAC system was insufficient. [Doc. 47-6 at 64].

These are addressed separately below.

The first difficulty in addressing these issues is presented by the fact that the Plaintiffs' forecast of evidence fails to include the plans and specifications.  As such, there is no evidence before this Court regarding what *was to be built*, in order to compare it to what *was built* so that a determination can be made as to whether there is a forecast of evidence of any deficiency in such construction.  The Court will address each of the specific defects the Plaintiffs advocate.

Plaintiffs argue that they have presented a forecast of evidence that RCM constructed the stairs from the main level to the basement in a manner that is not in accord with the plans. [Doc. 47 at 11].  For support, Plaintiffs cite to a particular page of the transcript of the deposition of Timothy Adams, their design architect. [Id. at 4].  There he simply states that the stairs are not to code.  He does not state the nature of the defect in the construction.  He does

not say whether they were built in accord with the plans. In short, the Plaintiffs have presented no evidence that any stairs were constructed in a manner at variance with the plans and specifications, much less what the defect may be.

The Plaintiffs argue that the masonry walls are defective. On this point the Plaintiffs again cite to the deposition testimony of Adams. That testimony, however, is purely hypothetical. He states "if, in fact, masonry was not bearing on proper support, that's out of code." [Doc. 47-12 at 4]. The Plaintiffs cite to no forecast of evidence that the masonry was not bearing on proper support, or even what support was designed to have been built. Again, Plaintiffs forecast of evidence is wanting.

The Plaintiffs next cite to the manner of construction of the stud walls in the basement. For this they cite to the testimony of the design engineer on the project, Pierre Coiron. "[T]hey actually varied the heights of the studs in order so that even though the first - the slab on grade wasn't right, they were going to make the main floor right. So how they did this, they achieved this by means of just varying the stud heights in order to achieve a flat floor." [Doc. 47-10 at 141]. Sorting through these two convoluted sentences, the Plaintiffs evidence is that RCM constructed the stud walls so as to make the main floor

level. One would presume (nothing else appearing) that the plans called for the main floor to be level. Therefore, this does not identify any defect. The only hint of a defect in this testimony was the conclusory remark that "the slab on grade wasn't right." Once again, however, there is no evidence as to what defect existed in the slab or how it failed to comply with the design RCM was to build.[3]

Plaintiffs next assert that RCM placed rebar (steel reinforcing bars) rather than wire mesh in the concrete slab. [Doc. 47 at 7]. Plaintiffs' engineer testified that the reinforcement was not needed because the slab was non-structural. [Doc. 47-10 at 119]. Therefore, it appears that the gist of Plaintiffs' argument is that RCM breached the contract by placing *more* reinforcement in the slab than the plans called for. Ignoring the issue of whether exceeding the standards of the plans and specifications constitutes a breach, the Plaintiffs have failed to present any forecast of evidence as to *what* the plans actually called for RCM to install. Plaintiffs also assert that the rebar was installed without "chairs" such that it was "not engaged" in the concrete. [Id. at 119-20]. Even though the record is far from clear, it appears that this

---

[3] Plaintiffs also assert that the framing of the residence was not in accord with the plans. [Doc. 47 at 8]. The pages of the Coiron deposition to which Plaintiffs cite, however, refer again to the issue of the uneven studs used to make the main floor level. [Doc. 47-10 at 140-41]. As such, this appears to be a repetition of this same issue.

14

means that the rebar was actually situated at the very bottom of the slab rather than being vertically centered. Plaintiffs' engineer, however, went on to testify that this "wouldn't have made any difference." [Id. at 120]. In light of the fact that reinforcement was not needed, Plaintiffs have presented nothing showing that any incorrect installation of the reinforcement was of any consequence, and therefore have failed to show that it was an any way a material breach.

Plaintiffs next assert that RCM failed to build in accord with the plans by building a certain concrete masonry unit (CMU) wall below grade. [Doc. 47 at 12]. Of course, building CMU ("cinder block") walls below grade is an extremely common practice, but Plaintiffs assert that it was contrary to the design. Once again, however, Plaintiffs have failed to show what was designed, so there is no evidence that building the CMU wall below grade was a deviation from the plans. Moreover, the evidence to which Plaintiffs cite on this point is far from clear. The architect, Adams, was asked in his deposition "Can you tell by looking at those whether or not the CMU was above or below grade?" to which he answered "This would be below grade for sure. This, I cannot tell." [Doc. 47-12 at 57]. The testimony then moves on to another topic. That is all. There is no way to determine the antecedents of "those"

and "this". The Court cannot say that this testimony constitutes a forecast of evidence sufficient to survive summary judgment on this claim.

The last defect about which the Plaintifs specifically argue in response to the Motion for Summary Judgment concerns the HVAC system. The only evidence to which the Plaintiffs cite, however, is the deposition testimony of Plaintiff Robert Gunkel that he ordered the demolition of the HVAC system RCM had installed because he was advised by "experts"[4] who had "determined that the design was flawed." [Doc. 47-6 at 64]. There is no evidence that RCM failed to build what was designed. So once again the Spearin Doctrine bars this claim. Curiously, the Plaintiffs argue that RCM designed the HVAC system. The contract, however, places no such design obligation on RCM. Plaintiffs offer no explanation for how RCM breached the contract in designing a system it had no obligation to design. Moreover, Plaintiffs cite to nothing in the record to support their naked assertion that the Defendant designed the system. Even if RCM had, however, Plaintiffs make no claim in their Complaint regarding any improper designing by RCM, of the HVAC system or of anything else.

In summary, as to each construction defect advocated by the Plaintiffs

---

[4] Plaintiff Robert Gunkel only refers to what he was told by a representative of the Carrier franchise in Clayton, Georgia. [Doc. 47-6 at 64]. This is inadmissible hearsay.

in response to the Motion for Summary Judgment, there is no forecast of evidence before this Court on which Plaintiffs can proceed to trial. Even the specific portions of the record to which Plaintiffs cite do not support their claims. The Defendants have presented the opinions of properly designated expert witnesses that refute the Plaintiff's assertions and allegations. The Plaintiffs have responded with nothing of substance.

In addition to the evidence cited in their brief, the Plaintiffs have submitted affidavits of Adams, the design architect; Coiron, the design engineer; Allen Morris, an engineer-in-training (EIT)with Coiron's firm;[5] and David Miller who is an engineer in another firm. To these affidavits Plaintiffs attach expert reports of these individuals. Plaintiffs, however, did not designate these affiants, or anyone else, as expert witnesses they intended to offer in this case. The Plaintiffs affirmatively stated in answer to Interrogatories that they had retained no experts. [Doc. 48-1 at 4]. The Plaintiffs did not even identify Miller as a "person with knowledge" in their Rule 26 disclosures. [Doc. 48-4].

To the extent the Plaintiffs are intending to rely on these opinions and

---

[5] At the time of signing the affidavit Morris identifies himself as a registered engineer (PE)[Doc. 47-3 at 5], but as of the time of the issuance of his report he identifies himself as an EIT. [Id. at 7].

reports, the procedural history of this case makes the Plaintiffs' failure to designate experts difficult to understand. The original Case Management Order set July 1, 2011, as the deadline for the Plaintiffs to designate experts and provide their expert reports pursuant to Rule 26. [Doc. 17]. The parties moved jointly for an extension of several deadlines, including for the designation of experts. The Court granted the motion and extended the Plaintiffs' deadline for designating experts to February 1, 2012. [Doc. 22]. Extensions of the deadlines in the Case Management Order are not lightly granted in this Court. Then on April 25, 2012, long after the Plaintiffs' expert deadline had passed, the parties yet again moved to extend certain deadlines in the Case Management Order, such as the discovery deadline and the motions deadline. No request, however, was made to extend the expert deadline again. Apparently Plaintiffs were satisfied with not designating any experts. As set out elsewhere in this decision, the reports and opinions of the three engineers and the architect are of little value to the Plaintiffs in making their case. For this reason the Court can only conclude that the decision not to designate these men as experts was intentional. The Plaintiffs submitted these reports at the eleventh hour, after discovery had closed and only in response to the Motion for Summary Judgment. The limited relevance of

these opinions to this case is underscored by the fact that the Plaintiffs do not rely heavily on these affidavits and reports in their summary judgment brief. They state that they present them in opposition to summary judgment, [Doc. 47 at 3], but then argue that they are presented only as lay opinion, not expert opinion. [Id. at 6]. Plaintiffs do, however, go on to cite to certain select portions thereof.

For these reasons the Court must examine the reports and opinions and address whether they need to be excluded because of the lack of expert designations by the Plaintiffs.

Rule 26(a)(2) of the Federal Rules of Civil Procedure imposes specific requirements for the disclosure of expert testimony during the discovery period. A plaintiff must disclose [the] expert by the date provided by a court's pretrial order. In addition, an expert witness's report must contain:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case. Fed.R.Civ.P. 26(a)(2)(B).

Thus, the expert report should be written in a manner that reflects the testimony the expert witness is expected to give at trial.

Pursuant to Rule 37(c)(1), a party who fails to properly designate an expert witness as required by Rule 26(a) may not use the expert at trial, unless the failure was substantially justified or harmless. The party facing sanctions carries the burden of showing that the failure to comply with Rule 26(a) was either substantially justified or harmless.[6] In determining whether a party's failure to properly designate an expert was substantially justified or harmless, a court should balance: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the explanation would disrupt the trial; (4) the importance of the evidence and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

Campbell v. United States, 470 F. App'x. 153, 155-56 (4th Cir. 2012) (internal quotations and citations omitted).

Here, the Plaintiffs concede that they did not comply with Rule 26. The first, second, third and fifth factors set out in Campbell clearly dictate that any expert opinions offered at this stage should be excluded. The Plaintiffs argue instead that these four affidavits and reports are merely providing the witness's observations, not expert opinions. Thus, Plaintiffs claim these witnesses may be received as lay witnesses pursuant to Rule 701 of the Federal Rules of Civil Procedure. That Rule provides that when a witness does not testify as an expert, his or her opinion must be limited to one that is

---

[6]The Defendants have not moved for sanctions against the Plaintiffs for the failure to designate experts. Their argument is that without experts, the Plaintiffs cannot sustain their burden to show genuine issues of material fact sufficient to defeat summary judgment.

rationally based on the witness's perception, helpful to determine a fact in issue and "not based on scientific, technical, or other specialized knowledge[.]" Fed.R.Evid. 701.

The Court first considers whether the affidavit and report prepared by Miller is truly lay witness evidence or expert opinion. Miller is an engineer, but was not involved in the preparation of the structural engineering plans used in the construction of the residence. [Doc. 47-5]. Nor was he involved in the construction itself. [Id.]. Miller was retained by the Plaintiffs for the express purpose of identifying "construction problems and defects, including drywall that was cracked, cracking in the basement slab and water infiltration through the concrete masonry unit block that the general contractor used in place of the cast-in-place concrete called for by the plans."[7] [Id. at 2]. He opines that the manner in which the steel rebar was used on the slab "is indicative of poor construction technique and may have contributed to or worsened the cracking that occurred in the concrete slab as a result of the slab settlement." [Id. at 3]. Attached to the affidavit are thirty-six pages consisting of his report and photographs. Miller reports on the results of scientific tests he conducted beneath the slab, analyzes various issues and includes recommendations for

---

[7] Again, the plans are not in evidence, so this statement merely represents Miller's interpretation of the plans and what they call for.

remediation. [Id. at 5-9]. Most importantly, however, Miller undertook to conduct geotechnical testing below the slab. [Doc. 47-5 at 21-24]. He concluded from this testing that the soils beneath the foundation are of an insufficient load bearing capacity, resulting in the settlement of the foundation. [Id.].[8]

> The United States Court of Appeals for the Fourth Circuit has observed that "the line between lay opinion testimony under Rule 701 ... and expert testimony under Rule 702 is a fine one" and "not easy to draw." Generally, a lay opinion "*must* be based on personal knowledge" whereas expert opinion may be based on personal knowledge but must involve "some specialized knowledge or skill or education that is not in possession of the jurors." "Rule 701 forbids the admission of expert testimony dressed in lay witness clothing, but it does not interdict all inference drawing by lay witnesses." The Advisory Committee's notes explain "that lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field." Accordingly, "a lay witness with experience could testify that a substance appeared to be blood, but ... a witness would have to qualify as an expert before he could testify that bruising around the eyes is indicative of skull trauma."

United States v. Howell, 472 F. App'x. 245, 246 (4th Cir. 2012) (quoting United

---

[8] It is noted that the date of Miller's report is January 9, 2012, [Doc. 47-5 at 20], long before the expert deadline. [doc. 22]. There is, however, no indication in the record that the report was disclosed to the Defendants, or that Miller's deposition was ever taken, or that the Defendants were even aware that Miller had done the testing so that they could decide whether to seek to take his deposition.

States v. Perkins, 470 F.3d 150, 155 (4th Cir. 2006); Fed.R.Evid. 701 advisory committee notes) (emphasis in original).

Here, the evidence to be presented through Miller is clearly "expert testimony dressed in lay witness clothing" because his conclusions are based not on his life experience or observations during construction but on his knowledge, skill, training and education as an engineer. Id. It is also based on very specialized scientific tests which he conducted and his analysis of the results thereof. He thus is testifying based on his specialized knowledge which is not in the possession of the jurors. Id. "A critical distinction between Rule 701 and 702 testimony is that an expert witness must possess some specialized knowledge or skill or education that is not in possession of the jurors." United States v. Johnson, 617 F.3d 286, 293 (4th Cir. 2010) (internal quotation and citation omitted). "Here, we have exactly what Rule 701 forbids." Id. Miller's affidavit and report focus on certain cracking in the drywall and the slab and in providing his professional opinion as to what should be done to remedy these problems. [Doc. 47-5 at 21-24]. All of the evidence to be presented through Miller is based on his credentials and training as an engineer, not his observations as a lay person. Indeed, Miller was retained after the construction and "[h]is post-hoc assessments cannot

be credited as a substitute for the personal knowledge and perception required under Rule 701." Johnson, 617 F.3d at 293.

It must be noted that even if Miller's testimony were to be allowed, it would be of little benefit to the Plaintiffs' case against RCM. His opinions pertain to the issue of the settling of the slab. He undertook substantial scientific testing of the soils underlying the slab. Nowhere does he dispute, however, that RCM complied with the contract in building on undisturbed earth. He simply opines that the undisturbed earth consisted of loose material. [Doc. 47-5 at 23]. In fact, the tests show that the deeper soil, which Miller himself specifically referred to as being undisturbed soil, is of a lesser load bearing capacity than that found nearer the slab. [Id.]. As such, Miller offers a professional learned opinion as to the cause of the settlement, but he has presented no forecast of evidence that RCM failed to build in accord with the contract.

Similar problems exist regarding the testimony and reports prepared by Adams, the architect who designed the house and prepared the architectural drawings and plans. Attached to Adams affidavit are two reports, the first of which is not even his report, but a report of someone named Campbell Doughty. The Doughty report is dated April 2009, after the parties had

entered into the Dissolution Agreement and RCM had left the project. [Doc. 47-2]. Adams' states in his affidavit that the April 2009 report "summariz[es] Doughty's observations at the house and the ways that RCM deviated from the architectural plans prepared" by Adams. [Id.]. The conclusions in Adams's affidavit, however, are not based on his contemporaneous observation of RCM's actual construction of the house. Indeed, Adams was not present at the site during construction except on one occasion to view the foundation. [Doc. 45-4 at 13; Doc. 47-2 at 3]. In his affidavit, Adams does not make any statement relating to what he actually saw during construction. [Id.]. Moreover, at his deposition, Adams testified that he could not answer questions concerning whether there was adequate supervision of the job because he was not there "on a day-to-day basis[.]" [Doc. 47-12 at 4]. Doughty's conclusions in the April 2009 report that RCM failed to follow the plans are based on a visit made to the site after RCM was no longer working there. As such, these are determinations made based on education, skill, training and experience as an architect.

Doughty's report presents several problems, aside from the Plaintiffs' failure to designate either Adams or Doughty as an expert witness. First, almost none of Doughty's report pertains to the issues Plaintiffs raise in this

suit.  Eight of the items listed pertain to the Octagonal porch, which is not the subject of any allegations by the Plaintiffs.  Several others pertain to whether features were installed in accord with the *landscape* plan.  The contract says nothing about any responsibility RCM may have for effectuating the landscape plan.  To the extent that any of the items in the Doughty report have any connection to the arguments Plaintiffs have presented in opposition to the Motion for Summary Judgment, such connection is at best tangential.  The Plaintiffs, however, have not articulated what such connection may be.  The Court would be left to speculate as to whether these opinions by Doughty support Plaintiffs' arguments in any way.

The second problem with Doughty's report is that it is not under oath.  The Plaintiffs attempt to get these opinions in "through the back door" by having *Adams* attach them to his affidavit.  Rule 703 of the Rules of Evidence, however, requires that expert opinions be based on "facts and data."  It does not allow for one to simply adopt the opinion of another for the purpose of presenting it as his own.  Moreover, Adams's reference to and reliance on Doughty's report entirely negates the Plaintiffs' argument that Adams's opinion is lay opinion under Rule 701, because lay opinion must be "rationally based on the witness's perception."  It cannot be based upon the witness's

adoption of *someone else's* perception.

The second report attached to Adams's affidavit is at least his own report. It stems from a visit to the residence in September 2011, almost seven months after this litigation was instituted. [Id. at 9]. In this report he acknowledged that he had not visited the site "since the foundation stage" and that the purpose of this second report was to

> look at the execution [of the construction] with an eye for what is considered reasonable and *within industry standards*. With all of this said, my findings really are concentrated on elements, that *in my professional opinion*, are insufficient relative to *generally accepted building standards or ongoing structural issues*.

[Id. at 9] (emphasis added). Such professional opinion is clearly expert testimony. This report, however, does little to support the Plaintiffs' arguments. Most of the entries pertain to the issue of the deflection of the slab, but Adams proffers no opinion at all pertinent to the salient issue of breach. He states that the deflection indicates that the "concrete slab was *either* poured out of level *or* has settled significantly." [Doc. 47-2 at 9]. As stated above, based on the evidence presented, settlement of the slab does not indicate that RCM breached the contract because it is uncontroverted that RCM did as instructed in the plans and installed the footings on undisturbed soil.

Adams's testimony, as shown by his affidavit and deposition, is not based solely on his personal knowledge. United States v. Roe, 606 F.3d 180, 185 (4th Cir.), cert. denied __ U.S. __, 131 S.Ct. 617, 178 L.Ed.2d 448 (2010). "[W]hile lay opinion testimony *must* be based on personal knowledge, expert opinions may also be based on first hand observation and experience." Id. (internal quotation and citation omitted). Adams's opinion, however, is not based on his first hand observation of RCM's actions, but sets forth his professional opinion formed after the fact. Worldwide Network Services, LLC v. Dyncorp Intern., LLC, 365 F. App'x. 432, 443-44 (4th Cir.), cert. denied __ U.S. __, 131 S.Ct. 224, 178 L.Ed.2d 135 (2010) (reports in which previous performance was evaluated were technical reports containing security details beyond the realm of common experience and thus constituted expert testimony); United States v. Chapman, 209 F. App'x. 253, 265 (4th Cir.), cert. denied, 550 U.S. 949, 127 S.Ct. 2286, 167 L.Ed.2d 1117 (2007) (testimony about historical or narrative facts perceived by witness is proper lay testimony). "Rule 701 permits lay witnesses to offer an opinion on the basis of relevant historical or narrative facts that the witness has perceived." Certain Underwriters at Lloyd's, London v. Sinkovich, 232 F.3d 200, 203 (4th Cir. 2000). The rule does not, however, "permit a lay witness to express an

opinion as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness." Id. Such is the case with Adams's testimony and his reports. Having failed to designate him as an expert witness and having failed to offer any explanation for that failure, the Court determines that Adams's affidavit and report are inadmissible except as to his personal observations during the preparation of the plans and during the course of construction. As stated previously, however, with or without this limitation, Adams's testimony is insufficient to allow Plaintiffs' forecast of evidence to survive summary judgment.

Likewise, the affidavits and reports of Coiron and Morris of Stability Engineering contain expert opinions. Coiron did not personally visit the property until December 2011, almost eleven months after this litigation had been initiated. [Id.]. After this "inspection," Coiron "prepared a written report summarizing [his] observations and the construction defects[.]" [Id.]. Despite the fact that RCM had not been on the job at any time after February 2009, Coiron stated in his affidavit that the purpose of his December 2011 visit was to insure that RCM was constructing the house in accordance with his engineering plans. [Id. at 3-4]. In contrast to this statement, Coiron's report contains a statement that its purpose is an Inspection Report for "Post-

construction damage." [Id. at 19]. The record does not disclose who continued the work on the residence between the time RCM was dismissed from the job in February 2009 and the time of Coiron's visit nearly three years later. Coiron gives no explanation for how he attributes any particular work to RCM as opposed to its successors.

Nonetheless, Coiron makes the following conclusions in this report: (1) if the soil had been properly placed, compacted and graded, vertical settlement would not have occurred; (2) the settlement was not caused by "design errors regarding the size of the foundation." [Id. at 19-20]. Coiron concluded that the improper soil compaction was "the root of most of the problems with this structure." [Id. at 20]. This, however, is in contrast to his deposition testimony, in which he apparently conceded that his engineering plans called for the contractor to excavate to undisturbed soil for the placement of the footings. [Doc. 45-5 at 14]. It is undisputed that RCM complied. [Doc. 55 at 23]. Coiron also testified that the plans did not call for the contractor to test the soil. [Doc. 45-5 at 33-34]. The contract did not place any such duty on the contractor either. [Doc. 45-2]. Coiron testified, however that his interpretation of the International Residential Code (IRC) places that duty on the contractor. [Doc. 47-10 at 2-5].

This contradiction underscores the prejudice in the Plaintiffs not designating Coiron as an expert. If he had been designated, Plaintiffs would have been required to provide his report before he was deposed and then he could have been examined regarding these contradictions. Now the Defendants are left with Coiron giving deposition testimony favorable to the Defendants and then blind-siding them with a contradictory report and affidavit in opposition to summary judgment.

There are two additional problems with Coiron's report and testimony. First, as stated earlier, his conclusion is based on his opinion that the law imposed on RCM the obligation to test the load bearing capacity of the soil, even though Coiron conceded that nowhere in the building code does it say that, [Doc. 45-5 at 5], and the contract is silent on the issue. [Doc. 45-2]. As such, Coiron's position is based upon a legal opinion which he is not competent to present and which Plaintiffs' counsel does not advocate.

The second problem with Coiron's report and testimony is that his other opinions are based on Miller's conclusions (i.e. the report of the engineers from Nova Engineering).[9] [Doc. 47-10 at 13]. An opinion is not admissible if

---

[9] It is noted against that the report of Miller's tests was prepared long before the expert deadline, but nothing in the record shows that it was disclosed until after the Defendants filed their Motion for Summary Judgment.

it is simply a recounting of the opinions of others.  An expert witness can testify to an opinion based on facts and data gathered by others, but not even an expert can testify to an opinion based on the conclusions or opinions of others. Fed. R. Evid. Rule 703.

For these reasons, Plaintiff's assertion that Coiron's reports and opinions are merely proper lay opinion is without merit.  To the extent that Coiron's reports and opinions would have been admissible at all, they are expert opinions being offered by a person who was never designated as such pursuant to Rule 26.  Therefore, the Court determines that Coiron's opinions must be excluded from consideration.

Morris's affidavit refers to his inspections of the property in April 2009, July 2010, and January 2012. [Doc. 47-3 at 3].  Without noting that each of these inspections occurred after RCM's departure from the project, Morris opines as follows:

> The purpose of my inspections was to observe work in place and to determine if RCM was constructing the residence in accordance with the plans prepared by Stability Engineering. During each of my site visits, I observed that RCM failed to follow the structural engineering plans that were designed by Stability Engineering, and that this failure led to substantial settlement of the foundation and stone masonry that was unsupported in contradiction to the plans.

[Doc. 47-3 at 4].  Morris made a final conclusion that the settlement at the

residence "was not the result of insufficient load capacity in the foundation, but was the result of soil settlement, which was caused by improper soil compaction." [Id.]. Morris's reports are replete with conclusions that the problems with the residence were caused by improper soil compaction. [Id. at 6-32]. As stated previously, however, neither the compaction nor the testing of the degree of compaction have been shown to be the responsibility of RCM.

Moreover, Morris's conclusions regarding soil compaction (just like Coiron's) were based on the tests conducted and analyzed by Miller of Nova Engineering. Just as Miller's opinions were excluded, the opinions based on Miller's conclusions must be excluded. To the extent that Morris may have come to any independent conclusions based on Miller's data, this would necessarily be expert opinion.

For these reasons the Court determines that the opinions of Morris must be excluded from consideration.

It must be noted that the sum and substance of the excluded opinions of Morris, Coiron and Miller is that the problems with the structure were the result of settlement. Since the Plaintiffs' forecast of evidence fails to show any responsibility on the part of RCM for the soil conditions which may have

caused the settlement, the exclusion of these opinions is of little consequence to Plaintiffs' case.

The exclusion of expert evidence by these witnesses leaves no rebuttal to the Defendants' experts. Alford opined that the structural drawings prepared by Stability Engineering; that is, Coiron and Morris, present a design for a foundation that was inadequate to support the load of the house. [Doc. 44 at 9]. Johnstone opined that the design and drawings prepared by Adams were defective. [Id. at 12]. In addition, each expert opined that RCM and Garland performed the work in conformity with industry standards, reasonably followed the plans and complied with all building codes. [Id. at 9, 12]. Adams, Coiron and Morris have admitted they were not present during the construction of the house and thus, they have no personal observations of RCM's activity to which they may testify as lay witnesses. The only admissible evidence from these witnesses is limited to observations made after RCM had left the project. As such, the Plaintiffs have failed to show that there is any genuine issue of material fact regarding RCM's breach of the contract. Therefore, the Defendants are entitled to summary judgment on the breach of contract claims.

Plaintiffs' warranty claims are based on the same deficiencies they

advocate as having constituted a breach of the written contract. Therefore, the Defendants are entitled to summary judgment on the warranty claims as well.[10]

## C. Delay in Completion

Finally, the Plaintiffs claim that RCM breached the contract by failing to compete construction in a reasonable time. The contract did not contain a provision relating to a fixed time for completion of the project or stating that time is of the essence. [Doc. 45-2]. Indeed, the Plaintiffs conceded that they would "rather [the work] be right than quick," [Doc. 45-1 at 113], and that they hired RCM knowing its reputation for being slow. [Id.; Doc. 55 at 60-61]. As a result, they conceded that the time for completion was not material to the performance of the contract. Ball v. Maynard, 184 N.C. App. 99, 102, 645 S.E.2d 890, review denied 362 N.C. 86, 656 S.E.2d 591 (2007) (the parties

_____

[10] Plaintiffs' express warranty claim arises from a warranty set out in the "Dissolution Agreement" whereby the parties parted ways on this project. [Doc. 1 at 3]. This document [Doc. 47-13] is so poorly drafted (by the Plaintiffs' brother-in-law who is an engineer, not an attorney [Doc. 55 at 11; Doc. 48-2 at 11]) as to raise the question of whether it is simply an "agreement to agree" and therefore not a contract recognized in the law. ("This Dissolution [sic] will formalize the conditions under which the Owners and the contractor *will execute* a mutual release from the underlying contract." (emphasis added)). Since the Plaintiffs have not presented a forecast of evidence that RCM failed to build in accord with the contract, plans and specifications, the Court need not reach this novel issue. The Court notes, however, that the language of this Dissolution Agreement is so tenuous as to have prevented the Defendants from arguing that they were released by the terms of that agreement. [Doc. 7].

may waive or excuse delay where time is not a material element). It is also uncontroverted that the Plaintiffs made substantial changes to the plans as construction progressed. They therefore are unable to show a breach of any term related to the time for completion. Phelps-Dickson Builders, L.L.C. v. Amerimann Partners, 172 N.C.App. 427, 617 S.E.2d 664 (2005). While common law requires that contractual performance should be within a reasonable time where no such time is stated, see, Rodin v. Merritt, 48 N.C. App. 64, 268 S.E.2d 539 (1980), the Defendants' expert has opined that the work was performed within reasonable industry standards. [Doc. 44 at 12]. The Plaintiffs have offered no evidence in opposition to this opinion.

For these reasons the Defendants are entitled to judgment as a matter of law on the claim for breach of contract by delay.

As to each of Plaintiffs' breach claims, the forecast of evidence is insufficient to show that there is a genuine issue as to any material fact. Therefore, the Defendants are entitled to judgment as a matter of law on Counts I, II and III as set out in the Complaint.


**Fraud and Unfair and Deceptive Trade Practices**

The Plaintiffs allege that the Defendants committed fraud by "knowingly

and intentionally ma[king] false statements" to the Plaintiffs in that

> prior to the Contract being signed by the parties, he [Defendant Garland] gave the [Plaintiffs] a grossly low estimate for the cost of the construction of the residence and related improvements when he knew the actual cost of the construction would ultimately be far greater.

[Doc. 1 at 4, ¶17].

To prove a claim for fraud in North Carolina, a plaintiff must demonstrate: (1) a material misrepresentation of a past or existing fact; (2) that the representation was definite and specific; (3) that it was made "with knowledge of its falsity or in culpable ignorance of its truth"; (4) that the misrepresentation was made with the "intention that it should be acted upon"; (5) that the recipient of the misrepresentation reasonably relied and acted upon the misrepresentation; and (6) that the misrepresentation resulted in damage to the recipient. Horack v. Southern Real Estate Co. of Charlotte, Inc., 150 N.C. App. 305, 313, 563 S.E.2d 47, 53 (2002). An estimate is not a statement of a past or existing fact. It is, by definition, a prediction of the amount for which the contractor will be able to build the residence *in the future*. Also, an estimate is, by definition, not definite or specific. As such, RCM's estimate cannot form the basis for a claim in fraud.

In Count V the Plaintiffs assert a claim of unfair and deceptive trade

practices based on this same allegation. Plaintiffs seem to put little stock in this claim, however, as in their summary judgment brief they only present general platitudes pertaining to North Carolina's deceptive trade practices statute and only cite to cases that have nothing to do with construction estimates. Nonetheless, the Court will address the merits of the claim.

In <u>Quate v. Caudle</u>, 95 N.C. App. 80, 381 S.E.2d 842, <u>disc. rev. denied</u> 325 N.C. 709, 388 S.E.2d 462 (1989), the North Carolina Court of Appeals addressed the situation in which a contractor had "made a practice of quoting unrealistically low prices for the cost of erecting a log home so as to entice his customers to purchase his log home packages," and that he had "repeatedly misquot[ed] the cost of constructing log homes to his customers." <u>Id</u>. at 85, 381 S.E.2d at 845. The Court held that this supported a judgment under N.C. Gen. Stat. §75-1.1. Therefore, it is possible that knowingly making unrealistically low construction estimates in order to induce an owner to enter a contract could support a deceptive trade practices claim. That, however, is not the end of the analysis. In <u>Quate</u> the contractor gave the unrealistically low estimates to induce the owners to purchase a product - a log home package. In the present case there was no such product purchased by the Plaintiffs. They only contracted for the construction of their residence. Also,

in Quate, the construction contract at issue was a fixed price contract. In other words, the unrealistically low *estimate* was actually an unrealistically low *contract price*. The court found that the contractor entered into the contract with no intention of performing because he did not intend to complete the contract for the contract amount. As such, the contractor in Quate committed a fraud, and that fraud us therefore a deceptive trade practice. Synergy Financial, L.L.C. v. Zarro, 329 F. Supp. 2d 701, 711 (W.D.N.C. 2004). In the present case, however, the parties negotiated a cost plus contract, wherein the Plaintiffs affirmatively took the risk that the costs would increase above the estimates. The Plaintiffs did not avail themselves of the protection that is set out in Quate, and thus the holding therein does not extend so far as to help the Plaintiffs. The Plaintiffs' forecast of evidence also falls short of the facts found in Quate in that there is nothing to show that RCM "repeatedly misquoted the cost" or "made a practice of quoting unrealistically low prices." Quate, 95 N.C. App. at 85. The Plaintiffs merely assert that in this one instance his estimate was "grossly low," and this they argue only with the benefit of hindsight. It is uncontroverted that RCM prepared the estimate of $1,275,412.00 based on the 14 page set of "pricing plans" provided by Adams and Coiron. [Doc. 45-3 at 10]. On the day that the parties executed the

contract, the Plaintiffs provided to RCM the much more detailed 53 page set of "permitting plans." [Id.]. During construction the Plaintiffs made several changes to the project that entailed significant increases in the cost. [Doc. 45-1 at 5-12]. They changed the roof to be a true slate roof. [Id.]. The exterior siding was changed to a more expensive type. [Id.]. The insulation batting was replaced with more expensive spray insulation. [Id.]. The type and brand of windows was changed. [Id.]. They added an extensive patio that involved the building of a large retaining wall, and included the construction of a substantial spa on that patio. [Id.]. The entire fireplace and chimney design was revised to include additional masonry, rock cladding and horizontal and vertical steel members. [Doc. 44 at 11]. It is uncontradicted that these added a substantial sum to the cost to the project. [Id.]. RCM has presented the testimony of Michael Johnstone, a licensed architect, who has opined that RCM's original estimate of construction costs based on the pricing plans was reasonable. [Id.]. Plaintiffs have presented no admissible evidence to challenge this. There is no evidentiary basis on which a jury could find that the Defendants gave the estimate knowing it was "grossly low". The Plaintiffs have only presented a forecast of evidence that the ultimate cost ended up being significantly higher than the estimate. That is insufficient. What portion

of the increase was due to the many expensive change orders as opposed to any purposeful "low-balling" by Garland is purely a matter of conjecture. Conjecture is insufficient to survive summary judgment.

Plaintiffs also alleged a claim based on RCM presenting unreasonably low estimates of the cost to complete *after* the parties had entered into the contract. [Doc. 1 at ¶17.b.]. For the same reasons the Defendant are entitled to summary judgment on that claim. In addition, any statement made after the parties entered into the agreement cannot have induced the Plaintiffs to contract with RCM.

For these reasons, the Plaintiffs' forecast of evidence on their claims for fraud and unfair and deceptive trade practices is insufficient to survivie summary judgment, and the Defendants are entitled to judgment as a matter of law.

## Negligence

The Plaintiffs claim that both Defendants were negligent in the construction of the house.

> Absent the existence of a public policy exception, as in the case of contracts involving a common carrier, innkeeper or other bailee, ... a tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract, even if

that failure to properly perform was due to the negligent or intentional conduct of that party, when the injury resulting from the breach is damage to the subject matter of the contract. It is the law of contract and not the law of negligence which defines the obligations and remedies of the parties in such a situation.

Spillman v. American Homes of Mocksville, Inc., 108 N.C. App. 63, 65, 422 S.E.2d 740 (1992) (citing North Carolina State Ports Authority v. Fry Roofing Co., 294 N.C. 73, 240 S.E.2d 345 (1978), abrogated in part on other grounds Trustees of Rowan Technicl College v. J. Hyatt Hammond Assocs., Inc., 313 N.C. 230, 328 S.E.2d 274 (1985)) (other citations omitted). Here, the Plaintiffs claim that RCM failed to perform the terms of the contract and that this "failure resulted in injury to the subject of the contract, the home." Land v. Tall House Bldg. Co., 165 N.C. App. 880, 883, 602 S.E.2d 1 (2004). "Thus, the law of contract, not the law of negligence defines the obligations and remedies of the parties." Id.

In North Carolina, the economic loss rule prohibits recovery for economic loss in tort because such claims are governed by contract law. Id. at 884 (internal citations omitted); William L. Thorpe Revocable Trust v. Ameritas Inv. Corp., 2012 WL 4193096 (E.D.N.C. 2012) ("North Carolina courts have applied the economic loss rule to prohibit recovery for purely economic loss in tort when a contract or warranty has already allocated the

risk.").

The only response made by the Plaintiffs concerns the claim against Defendant Garland individually.  Extrapolating one sentence out of a North Carolina Court of Appeals decision, the Plaintiffs claim that because only RCM, not Garland, had a contract with them they may pursue their tort claims against him.  In <u>Lord v. Customized Consulting Specialty, Inc.</u>, 182 N.C.App. 635, 643 S.E.2d 28, <u>disc. rev. denied</u> 361 N.C. 694, 652 S.E.2d 647 (2007), the plaintiffs entered into a contract with the defendant for the construction of their home.  Three years later, they sued the contractor because trusses supplied to the contractor by 84 Lumber were defective.  The homeowners later included 84 Lumber as a defendant and sued for damages based on the defective product.  84 Lumber argued that the economic loss rule precluded any claim against them.  In holding that the rule did not preclude the negligence claim, the Court noted that there was no contract between the homeowners and 84 Lumber upon which to base their claim for relief.  From this, the Plaintiffs leap to the conclusion that because Garland was not a party to the contract, they may proceed against him in tort.  Garland, however, was not a supplier to RCM nor did he have any subcontractor relationship with RCM. The rule set out in <u>Lord</u> is simply inapplicable.  The Plaintiffs have

presented no authority at all to support their novel proposition that they may, in substance, pierce the corporate veil in a contract case by simply claiming that the owner of the corporation was negligent in the performance of the contract. To the extent that the Plaintiffs claim that Garland was negligent, the same principles of the economic loss rule apply to prohibit recovery for purely economic loss in tort because the contract with RCM has already allocated the risk.

For these reasons the Plaintiffs' claims in negligence are barred by the economic loss rule. Thus the Defendants are entitled to judgment as a matter of law.

**Plaintiffs' Motion to Amend the Complaint**

Due to a typographical error in the Complaint [Doc. 1], the Plaintiffs alleged subject matter jurisdiction pursuant to 28 U.S.C. §1331 (federal question) rather than 28 U.S.C. §1332 (diversity). The Defendants moved to dismiss on the grounds that no federal question is present. [Doc. 7 at 1]. Plaintiffs then moved to amend to correct this one digit in order to bring the Complaint into conformance with the basis on which the parties have obviously understood this Court has jurisdiction in this case. For these reasons the Motion to Amend Complaint [Doc. 50] will be granted.

**ORDER**

**IT IS THEREFORE ORDERED** that the Plaintiffs' Motion to Amend Complaint [Doc. 50] is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 44] is hereby **GRANTED** and this matter is dismissed with prejudice.

Judgment is entered simultaneously herewith.

Signed: January 10, 2013

Martin Reidinger
United States District Judge